**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LORETTA BURTON, MICHAEL BURTON, *husband and wife*, | ) |
| | ) |
| | ) CIVIL ACTION NO. 3:09-288 |
| Plaintiffs, | ) |
| | ) JUDGE KIM R. GIBSON |
| v. | ) |
| | ) |
| AMBER L. PRICE, CINDY A. PRICE *also known as* CINDY CLINEDINST, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION OF COURT

### I. SYNOPSIS

This matter comes before the court after a bench trial was held on October 1, 2012. The parties dispute (1) the extent of Plaintiffs' damages from a November 25, 2007 motor vehicle accident caused by Defendant Amber L. Price's negligence and (2) whether Amber's mother, Cindy Price, was negligent in entrusting her vehicle to her daughter. For the reasons that follow, the court will grant Plaintiffs relief and enter judgment against Defendant in the amount of $9,095.80.

### II. JURISDICTION

This court has jurisdiction over the matter pursuant to 28 U.S.C. § 1332 because all parties to the action maintain diversity of citizenship and the amount in controversy exceeds $75,000. Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in Bedford County, Pennsylvania.

## III. BACKGROUND

On November 12, 2009, Plaintiffs Loretta and Michael Burton filed a three-count complaint, alleging negligence, negligent entrustment, and loss of consortium based on a November 25, 2007 motor vehicle accident. A vehicle driven by Defendant Amber L. Price ("Ms. Price") struck another vehicle in which Plaintiff Loretta Burton ("Mrs. Burton") was a backseat passenger. (Doc. 1, Compl. ¶ 7). As a result of the accident, Mrs. Burton alleges several injuries, including

> [n]eck pain; back pain, carpal tunnel syndrome; numbness and pain in her left arm, hand and leg; injury to her chest and stomach; blurred vision; injury to her nerves and nervous system . . . injuries to her body as a whole; and other injuries to which the full extent are not yet known . . .

(Id. ¶ 11). Mrs. Burton seeks damages for lost wages, decreased future earning capacity, medical expenses, and pain and suffering. (See id.). Plaintiff Michael Burton ("Mr. Burton") also seeks damages for loss of consortium. (Id. ¶ 19). After a series of continuances filed by the parties, a bench trial was held on October 1, 2012. (See Doc. 57, Trial Tr.). The parties filed their respective proposed findings of fact and conclusions of law on January 21, 2013 (Doc. 61) and January 22, 2013 (Doc. 62).

## IV. LEGAL STANDARD

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the court may enter judgment following a trial without a jury. See FED. R. CIV. P. 52(a). In making a decision following a bench trial, "The court must find the facts specially and state its conclusions of law separately." Id.; see also In re Frescati Shipping Co., Ltd., 718 F.3d 184, 196 (3d Cir. 2013). Accordingly, the court will discuss its factual findings and then proceed to conclusions of law.

2

## V.  FACTUAL FINDINGS

The court makes findings of fact with regard to the two main issues in this case: (1) whether Cindy Price should be held liable for negligently entrusting Amber Price to operate the vehicle used in the November 25, 2007 accident; and (2) the amount of damages for which Defendant Amber Price is responsible.[1]

### A.  The Motor Vehicle Accident

The accident occurred on November 25, 2007, at approximately 8:00 p.m. (See Doc. 57, Trial Tr., at 7, 8, 10). Mrs. Burton, her daughter, two of her grandchildren, and her daughter's boyfriend had been traveling in a Toyota Corolla in "bumper to bumper" traffic on the Pennsylvania Turnpike in Bedford County, Pennsylvania. (Id. at 10). Defendant Amber Price was travelling in a 2005 Buick Rendezvous when she struck Plaintiff's rented vehicle from behind at approximately five to ten miles per hour. (Id. at 94). At the time of impact, Mrs. Burton sat in the backseat on the passenger-side of the vehicle. (Id. at 9). During the collision, Mrs. Burton experienced "whiplash" and was "moved around." (Id. at 11). Nevertheless, none of the passengers involved in the collision sought medical treatment that day, and both vehicles were driven to their respective destinations after the collision, although the Toyota Corolla's trunk had to be tied down with rope. (Doc. 57, Trial Tr., at 10, 11).

### B.  Injuries from the Accident and Medical Evidence

According to Mrs. Burton, she was not in pain immediately after the accident. (Id. at 10, 11). When the investigating police officer at the scene asked whether anyone was injured, Mrs. Burton responded "no." (Id. at 40). A few days after the accident,

---

[1] At trial, Defendants conceded that Amber Price was negligent. (See Doc. 57, Trial Tr., at 3). Thus, whether Defendant Amber Price was negligent is not an issue in this case.

however, Mrs. Burton exhibited several symptoms and began to experience pain. When explaining her symptoms, Mrs. Burton noted, "[I had] [n]ausea. I couldn't sleep at night. I had headaches very bad. My balance was off, and I was dizzy. . . . I had chest pains, stomach pains. . . . [n]eck, shoulder, and back pain . . ." (Id. at 12).

On November 27, 2007—two days after the accident—Mrs. Burton visited the Chambersburg Hospital emergency room, complaining of neck and back pain. (Id. at 41; see also Def. Ex. A). According to the physician report at the emergency room, prepared by Dr. Brenda K. Oatman, Mrs. Burton "[had] some neck pain and back pain. She [was] very stiff and sore. No pain down the arms. No numbness or weakness. No chest pain or abdominal pain." (Def. Ex. A). Dr. Oatman diagnosed Mrs. Burton with "acute neck and back pain secondary to muscle strain status post motor vehicle accident." (Def. Ex. A). Further, Dr. Oatman stated in her report that X-rays were not necessary, that it was unlikely Mrs. Burton had any type of fracture, and that Mrs. Burton should follow up with her primary physician. (See Def. Ex. A).

The following day, Mrs. Burton returned to work. (Doc. 57, Trial Tr., at 43). It was not until December 28, 2007 that Mrs. Burton followed up with her primary physician—Dr. Debra Bavari—concerning her injuries. (Id. at 47). Dr. Bavari referred Mrs. Burton to physical therapy. (Id.). Mrs. Burton received eight physical therapy sessions between January 7, 2008 and February 8, 2008. (Id. at 47). At that time, Mrs. Burton's physical therapist, Jack Ellerton, noted in a "Progress Note" (Def. Ex. B) that Mrs. Burton's "condition continues to improve and is near normal." Mr. Ellerton found, "At this time, therapist feels that patient should receive at least a 30 day break before restarting therapy to see if patient's condition continues to improve . . . . It is very

4

possible patient's condition will resolve completely or at least remain the same which is very functional at this time." (Def. Ex. B).

As of January 23, 2008, Mrs. Burton also began treatment with Dr. Ian Newbold. (Doc. 57, Trial Tr., at 45). Dr. Newbold prescribed pain medication but never recommended physical therapy for Mrs. Burton. (Id. at 46, 51). At the time of trial, Mrs. Burton had been taking Percocet almost daily. (Id. at 48-51). In addition to prescribing pain medication, Dr. Newbold recommended Mrs. Burton consult with Dr. Caruso, a neurosurgeon. (Id. at 47). Dr. Caruso met with Mrs. Burton one time but did not recommend surgical treatment. (Id.; see also Pl. Ex. 2, Nov. 4, 2008 Letter).

Dr. Newbold prepared two opinion letters at the request of Mrs. Burton. The first letter—dated November 4, 2008—noted that nerve conduction studies "have all shown the same pathology in the left arm, which includes a moderate left carpal tunnel syndrome." (Pl. Ex. 2, Nov. 4, 2008 Letter). Dr. Newbold opined that, at the time of the accident, there was "in all likelihood severe head movement and probable concussion effects at the time." (Id.). However, the emergency report—prepared two days after the accident by Dr. Brenda K. Oatman (Def. Ex. A)—makes no mention of any severe concussion effects. Dr. Newbold also wrote in his November 4 Letter that Defendant Amber Price had been "talking on a cell phone" at the time of the accident and that "there was a severe impact on a door right by [where Mrs. Burton] was sitting," (Pl. Ex. B, Nov. 4, 2008 Letter). The record does not substantiate either of these claims.

On July 9, 2009, Dr. Newbold prepared a second letter. (Pl. Ex. B, July 9, 2009 Letter). The letter states, in relevant part, the following:

> In this accident, there was trauma to the cervical region, also the thoracic
> and lumbosacral region of the spine, as well as shoulder trauma and

numbness in the left leg with loss of power in that limb. Recently the situation has worsened, with neurophysiological and clinical evidence now of S1 radiculopathy in addition to other levels of trauma.

I most recently saw the patient today, and at this time there is worsening of the clinical signs in the left arm as well as the left leg. These clinical findings are supported by a recent study here at this office which confirms a moderate to severe bilateral left > right median neuropathy consistent with carpal tunnel syndrome, as well as a moderate left L5S1 radiculopathy with the S1 involvement now more pronounced that [sic] previously.

Mrs. Burton once again attended physical therapy between May 20, 2009 and June 19, 2009. (Id. at 49). However, neither Plaintiffs nor Defendants have offered supporting medical documentation as to Mrs. Burton's prognosis during or after these therapy sessions.

On December 15, 2010, Defendants required Mrs. Burton to submit to an Independent Medical Evaluation by Dr. Richard Kasdan. Dr. Kasdan reviewed Mrs. Burton's medical records and history, finding that Dr. Newbold performed an "inordinate number of EMG/nerve conductions, totaling five times." (Def. Ex. C, at 1-2). The results of those nerve conductions indicated that Mrs. Burton has "entrapment of her median nerves (carpal tunnel)," which was "not surprising in a patient who does repetitive hand movements as an occupation." (Def. Ex. C, at 2). Dr. Kasdan concluded that the carpal tunnel injury was most likely related to Mrs. Burton's employment and "would have nothing whatsoever to do with a minor rear-end injury." (Id.).

According to Dr. Kasdan, the subsequent L5S1 irritation discussed in Dr. Newbold's July 9, 2009 report would also have nothing to do with the minor rear-end injury: "It is interesting that the finding [of the L5S1 injury] did not show up on prior EMGs that [Dr. Newbold] performed, so I would certainly say that it at least had nothing

to do with the accident . . ." (Id.). Dr. Kasdan's report also mentioned that, in spite of having undergone five EMG/nerve conductions with Dr. Newbold, Mrs. Burton has "never had a diagnostic image of her neck or back such as a CT scan or an MRI." (Def. Ex. C, at 2). With respect to the physical exam itself, Dr. Kasdan mentioned that Mrs. Burton had full range of neck motion and "slow, but full range of back motion." (Id.). Dr. Kasdan ultimately concluded that Mrs. Burton had suffered a "cervical and lumbar strain as a belted passenger in a minor rear-ended injury" that likely healed by February 2008. (Id. at 3). In Dr. Kasdan's opinion, none of Mrs. Burton's currently alleged health complaints were supported by objective findings, and the carpal tunnel issues noted by Dr. Newbold likely resulted from her employment. (Id.).

During trial, Mrs. Burton continued to complain of blurred vision, pain in her neck and shoulders, and numbness in her left leg. (Id. at 48-49). She denied her condition being "near normal" as of February 2008. (Doc. 57, Trial Tr., at 47). As of the trial, Mrs. Burton continued to seek treatment from Dr. Newbold, although the visits were less frequent.

### C. Mrs. Burton's Daily Activities Before and After the Accident

At the time of the accident, Mrs. Burton was 49 years old and employed as a "picker/packer" in a warehouse setting operated by Ozburn Hessey Logistics ("OHL"). (See Doc. 57, at 15, 18, 41). According to Mrs. Burton, the job required her to take candy bars and boxes of cereal from a shelf and place them into boxes for shipping. (Id. at 51, 55). The job involved reaching and grabbing, and, occasionally, Mrs. Burton lifted heavy boxes. (Id. at 51-52). When asked on cross-examination whether she experienced pain in her wrists as a result of reaching and grabbing for items, Mrs. Burton stated "yes."

7

(Id. at 52). After the accident, Dr. Newbold placed Mrs. Burton on work restrictions, limiting the amount of weight she could lift to ten pounds. (Id. at 54, 66). As of January 2012, Mrs. Burton no longer worked at OHL. (Id. at 22). She was terminated from her employment because she could not lift 60 to 70 pounds, an essential requirement of her employment as of November 2011. (Id. at 53).[2] Mrs. Burton remained unemployed at the time of trial. (Id. at 4).

Aside from employment, Mrs. Burton maintained an active lifestyle before the accident. She attended her grandchildren's sporting events, performed household chores such as laundry and cooking, and exercised three days per week with her husband. (Id. at 23, 25, 34). Due to the pain in her neck, shoulder, and back, Mrs. Burton now exercises one or two days per week. (Id. at 27). Similarly, Mrs. Burton no longer lifts heavy laundry baskets and has trouble standing or walking for long periods. (Id. at 34).

### D. Plaintiffs' Marital Relationship

As of trial, Mr. and Mrs. Burton had been married 37 years and had lived together continuously throughout their marriage. (Doc. 57, Trial Tr., at 72, 73-74). Mr. Burton is retired from the United States Army and enjoys exercise. (Id. at 75). Prior to the accident, Mr. and Mrs. Burton would exercise together frequently and would participate in many family activities together, particularly bowling. (Id. at 78). After the accident, however, Mrs. Burton no longer participated in physical activities as often, and Mr. Burton performed more household chores. (Id. at 79). In regards to intimacy, Mr. and Mrs. Burton also had less sexual intercourse, reduced from approximately 8 times per month before the accident to once per month after the accident. (Id. at 82).

---

[2] Although the parties dispute when the 60-to-70 pound lifting requirement became a work requirement, Mrs. Burton made clear at trial that she was not required to lift heavy weight until November 2011.

### E. Claimed Damages

According to Plaintiff's Pretrial Statement, Plaintiffs seek $5,729.84 for medical bills and $7,878.00 in lost wages. (Doc. 27, at 2). In Plaintiffs' Proposed Findings of Fact and Conclusions of Law, however, Plaintiffs claimed $15,455.52 in unpaid medical bills, and Plaintiffs made no mention of diminished earning capacity. (Doc. 62, at 3). Plaintiffs provided some documentation to support days of work Mrs. Burton missed due to medical treatment or excuse, alleging 124 days in total. (See Doc. 57, Trial Tr., at 19; Pl. Ex. 3). When Mrs. Burton lost her job at OHL, she was earning $11.10 in hourly wages. (Id. at 20). As stated previously, Plaintiffs also request damages for Mr. Burton's loss of consortium claim and for Mrs. Burton's pain and suffering claim.

## VI. CONCLUSIONS OF LAW

### A. Negligent Entrustment

Plaintiffs assert that Cindy Price negligently entrusted the operation of the motor vehicle to her daughter Amber Price and that, because the vehicle entrusted to Cindy was used in the accident, Cindy Price should be held liable for damages incurred upon Plaintiffs. Defendants contest this assertion and argue that Cindy Price did not negligently entrust the vehicle to Amber Price, thus absolving Cindy Price of any tort liability for the damages incurred.

The tort of negligent entrustment is defined in Restatement (Second) of Torts § 308 as follows:

> It is negligence to permit a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others.

9

"[A] cause of action for negligent entrustment is based upon the permissive use of a thing . . ." Donegal Mutual Ins. Co. v. Fackler, 835 A.2d 712, 720 (Pa. Super. Ct. 2003). Section 308 imposes liability on a defendant because of her own acts in relation to an instrumentality or activity under her control; an entrustor's liability is not dependent on, derivative of, or imputed from the entrustee's actual liability for damages. See Mendola v. Sambol, 71 A.2d 827, 829 (Pa. Super. Ct. 1950); Christiansen v. Silfies, 667 A.2d 396, 400 (Pa. Super. Ct. 1995).

An initial requirement for liability under a negligent entrustment theory is a finding that the entrustee was causally negligent. See, e.g., Silfies, 667 A.2d at 400 ("In several decisions, this court has held that liability for negligent entrustment does not attach to the entrustor until the entrustee uses the entrusted instrumentality negligently, and is found *causally responsible* for ensuing harm.") (emphasis in original). Thus, to be liable for negligent entrustment, not only must the entrustee be found to have actually caused the harm in a negligent manner, but also it must be shown that the entrustor knew or had reason to know that the entrustee intends or is likely to act in the negligent manner bringing about the injury.

In turn, the court must here determine whether Cindy Price knew or should have known that Amber Price intended to or was likely to operate the motor vehicle in such a way as to create an unreasonable risk of harm to Plaintiffs. At trial, however, when Plaintiffs rested their case, Defendant Cindy Price moved for a compulsory nonsuit with regard to the negligent entrustment claim because there was no evidence demonstrating that Cindy Price "should not have entrusted the vehicle to Amber Price on the day of the accident." (Doc. 57, Trial Tr., at 84).

After the court clarified that there was no agreement between counsel and that this issue would be addressed only on cross-examination during Defendants' case in chief, the court granted the motion for compulsory nonsuit and found that Cindy Price was no longer a party to the case. (Id. at 86). Consequently, the court found that the only issue to be tried was the amount of damages as it related to the liability of Amber Price. Thus, for these reasons, the court again holds that the negligent entrustment claim is dismissed and Cindy Price is no longer a party to the case.

### B. Damages

As to the issue of damages—the only issue in this case—the court begins with a discussion of the applicable legal framework. Under Pennsylvania law, for a Plaintiff to recover on a negligence cause of action, she must prove a causal relationship between the breach, the resulting injury, and the actual loss. See J.E.J. v. Tri-Cnty. Big Bros./Big Sisters, Inc., 692 A.2d 582, 584 (Pa. Super. Ct. 1997); Burman v. Golay & Co., Inc., 616 A.2d 657, 659 (Pa. Super. Ct. 1992); Maliszewski v. Rendon, 542 A.2d 170, 172 (Pa. Super. Ct. 1988) ("It goes without citation that as a part of a tort action the plaintiff must prove that the injury claimed to have been sustained and for which recovery is sought was caused by the tortious act or force of the tortfeasor."). In a personal injury case, Pennsylvania law makes clear that, when there is no obvious causal connection between the accident and injury, "unequivocal medical testimony is necessary to establish the causal connection." See Albert v. Alter, 381 A.2d 459, 470 (Pa. Super. Ct. 1977) (citations omitted); see also Rendon, 542 A.2d at 172; Lattanze v. Silverstrini, 448 A.2d 605 (Pa. Super. Ct. 1982). An obvious causal relationship exists when the injury is an "immediate and direct" or "natural and probable" result of the complained of act. See

11

Lattanze, 448 A.2d at 608 (citations omitted).  The injury and the act must be so closely connected that a lay person could diagnose the causal connection.  Id.

The instant matter falls within cases requiring expert medical testimony.  In other words, the court must review the expert medical testimony "to establish that the injury in question did, with a *reasonable degree of medical certainty*, stem from the [complained of] act."  Hamil v. Bashline, 392 A.2d 1280, 1285 (Pa. 1978) (emphasis added).  As to the burden of proof, plaintiff must prove the alleged damages sustained with reasonable certainty.  Gordon v. Trovato, 338 A.2d 653, 654 (Pa. Super. Ct. 1975) ("It is the burden of the plaintiff to establish by evidence such facts as will furnish a basis for the legal assessment of damages according to some definite and legal rule.") (citing Magar v. Lifetime, Inc., 144 A.2d 747 (Pa. Super. Ct. 1958)).

With this framework in mind, the court begins by finding that Plaintiffs have met their burden of proving a causal relationship between the accident and a physical injury in this case.  The medical documentation indicates that Mrs. Burton suffered a muscle strain as a result of the collision.  Specifically, two days after the accident, Dr. Oatman noted in her emergency room report that Mrs. Burton "was whipped around a bit" and suffered "acute neck and back pain secondary to muscle strain post motor vehicle accident." (Def. Ex. A).  Medical documentation provided by Defendants—that is, the Progress Report prepared by Mr. Jack Ellerton (Def. Ex. B) and the Independent Medical Evaluation prepared by Dr. Kasdan (Def. Ex. C)—corroborate this finding.

On the other hand, Plaintiffs—who have the burden of establishing causation— supplied just two pages of medical evidence, both of which are opinion letters written by Dr. Newbold.  (See Pl. Ex. 2).  These letters reflect a finding that Mrs. Burton suffered

neck and back pain from the vehicle accident. But Dr. Newbold further opined that Mrs. Burton suffered carpal tunnel syndrome and "numbness in the left leg" due to the accident, among other nerve injuries. (See Pl. Ex. 2, July 9, 2009 Letter). After carefully reviewing the record, the court finds that Mrs. Burton has not proved that any of these additional alleged injuries are causally related to the accident. Aside from Dr. Newbold's two single-page opinion letters, there is no evidence in the record suggesting injuries apart from temporary neck and back pain. Furthermore, the court does not credit or give weight to Dr. Newbold's conclusions of additional injuries causally related to the accident because he fails to provide the medical bases or reasoning to support those conclusions.    Dr. Kasdan also strongly disagreed with Dr. Newbold's findings, concluding that carpal tunnel "would have nothing whatsoever to do with a minor rear-end injury" and, instead, was likely attributable to Mrs. Burton's employment "picking product from an assembly line." (Def. Ex. C).

Based upon the objective medical evidence, the court further finds that any and all injuries causally related to the accident were healed as of February 2008. This finding is based on Mr. Jack Ellerton's diagnosis on February 8, 2008—who found that Mrs. Burton was "near normal" and "very functional" at that time—as well as Dr. Kasdan's opinion after his review of the medical documentation supplied to this court. The record is simply devoid of any objective medical evidence to the contrary. Using February 8, 2008 as the cutoff date for the injuries causally related to the vehicle accident in question, the court now considers the appropriate amount of damages in regards to (1) medical expenses, (2) lost wages and diminished future earning capacity, (3) pain and suffering, and (4) loss of consortium.

### i. Medical expenses

Both parties concede that this case is governed by the Pennsylvania Motor Vehicle Financial Responsibility Law ("MVFRL"), 75 Pa. Cons. Stat. Ann. §§ 1701-1799.7. Section 1720 provides, "In actions arising out of the maintenance or use of a motor vehicle, there shall be no right of subrogation or reimbursement from a claimant's tort recovery with respect to . . . benefits paid or payable by a program, group contract or other arrangement." 75 Pa. Cons. Stat. Ann. § 1720 (West 2010). Section 1722 further provides that

[i]n any action for damages against a tortfeasor . . . arising out of the maintenance or use of a motor vehicle, a person who is eligible to receive benefits under the coverages set forth in this subchapter . . . or any program, group contract or other arrangement for payment of benefits . . . *shall be precluded from recovering the amount of benefits paid or payable* under this subchapter . . .

Id. § 1722 (emphasis added). Thus, Mrs. Burton cannot recover medical expenses that have been previously covered by her insurance providers.

After reviewing the billing statements submitted by Plaintiffs, (Pl. Ex. 5), the court finds that most of Mrs. Burton's past medical expenses relating to this accident have been covered by her insurance providers, GEICO and Tricare. Although the billing statements in Exhibit 5 are presented in less than a straightforward and orderly manner,[3] the court calculates to the best of its ability that all medical expenses directly attributable to Mrs. Burton from the date of the injury—November 25, 2007—to the date the injury healed—February 8, 2008—is **$342.00**. The court notes that, at trial, Mrs. Burton could

---

[3] The court notes that Plaintiffs submitted Exhibit 5 as their sole evidence as to medical expenses. Exhibit 5 provides no summary sheet of expenses paid, and it is unclear in many instances whether the individual expenses noted on the medical statements were ultimately paid by insurers. The court has individually calculated out-of-pocket expenses to the best of its ability given the available documentation.

14

not estimate her out-of-pocket medical expenses, and Plaintiffs have not provided documentation to conclusively prove total out-of-pocket expenses. This court's calculation is based solely on documents provided by Plaintiffs in Exhibit 5.

### ii.    Lost Wages and Diminished Future Earning Capacity

Plaintiffs supplied the court with some evidence that Mrs. Burton missed work on numerous occasions. Attached to Plaintiffs' Exhibit 3 is a listing of dates in which Mrs. Burton had medical appointments or medical documentation requiring her not to work. From November 25, 2007 to February 8, 2008, Mrs. Burton missed a total of 158 hours at work.[4]  At an hourly wage of $11.10, and excluding taxes, Mrs. Burton lost **$1,753.80** in wages that can be causally linked to Mrs. Burton's injury in this case.

With respect to diminished earning capacity, Plaintiffs have failed to provide any documentation to suggest Mrs. Burton is currently limited in her ability to earn wages. Although Mrs. Burton is unemployed, there is no evidence to suggest that she is currently unemployed due to injuries sustained in the accident at issue. Furthermore, Mrs. Burton was terminated from her employment in January 2012, long after the court finds that Mrs. Burton healed from the injuries in question. Therefore, the court will not award damages based on diminished future earning capacity.

### iii.    Pain and Suffering

The court finds that the testimony and supporting medical evidence in this case undoubtedly confirms that Mrs. Burton experienced pain and suffering as a result of injuries sustained in the accident. Negligence behind the wheel of an automobile is a

---

[4] The supporting documentation lists the following missed days: two full days in November 2007; seven full 8-hour days in December 2007; four full 8-hour days in January 2008, as well as 30 additional hours; and three full 8-hour days in February 2008. The missed time amounts to 16 full days and 30 additional hours, totaling 158 hours.

15

serious matter with potentially devastating consequences. Although placing a dollar figure on pain and suffering is not a simple matter, nor one the court can precisely measure, the court will award **$5,000.00** in damages to compensate Mrs. Burton. The court believes this sum fairly, reasonably, and justly compensates Mrs. Burton for the pain and suffering she has undergone.

### iv. Loss of Consortium

Under Pennsylvania law, loss of consortium has been recognized as a "right growing out of the marriage relationship which the husband and wife have respectively to the society, companionship and affection of each other in their life together." Burns v. Pepsi-Cola Metro. Bottling Co., 510 A.2d 810, 812 (Pa. Super. Ct. 1986). Put differently, a loss of consortium claim belongs to the uninjured spouse and arises from the deprivation of the injured spouse's society and services. See Darr Const. Co. v. W.C.A.B. (Walker), 715 A.2d 1075, 1079-80 (Pa. 1998). The claim is derivative in nature, "emerging from the impact of one spouse's physical injuries upon the other spouse's marital privileges and amenities." Kowal v. Commonwealth, Dep't of Transp., 515 A.2d 116, 119 (Pa. Commw. Ct. 1986). Although a loss of consortium claim may be joined in the same civil action, it remains a separate and distinct claim. See, e.g., Anchorstar v. Mack Trucks, Inc., 620 A.2d 1120, 1122 (Pa. 1993).

In the instant case, Mr. Burton has undoubtedly experienced injuries to his marital relationship as a result of the accident. After the accident, Mr. and Mrs. Burton exercised together less frequently, participated in fewer family activities, and engaged in fewer sexual relations. (See Doc. 57, Trial Tr., at 80-82). Mr. Burton also performed more of the household chores and responsibilities. (Id. at 79). When asked how the vehicle

16

accident affected his life in general, Mr. Burton responded, "It affects me . . . because somebody I love, I see . . . is in so much pain and agony." (Id. at 82). The court is mindful that, similar to pain and suffering claims, a loss for consortium claim is incapable of precise pecuniary measurement. However, the court finds that the sum of **$2,000.00** fairly, reasonably, and justly compensates Mr. Burton for his losses.

## VII.    CONCLUSION

For the reasons stated above, Plaintiffs request for relief will be granted. The court will enter judgment in favor of Plaintiffs Loretta and Michael Burton and against Defendant Amber L. Price as follows: **$342.00** for past medical expenses; **$1,753.80** for lost wages; **$5,000.00** for pain and suffering; and **$2,000.00** for loss of consortium. The total damages calculation is **$9,095.80**. An appropriate order will issue.

KIM R. GIBSON
United States District Judge

Dated: September 18, 2013

17

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

LORETTA BURTON, MICHAEL       )
BURTON, *husband and wife*,         )
                              )  CIVIL ACTION NO. 3:09-288
        Plaintiffs,            )
                              )  JUDGE KIM R. GIBSON
    v.                         )
                              )
AMBER L. PRICE, CINDY A. PRICE )
*also known as* CINDY CLINEDINST, )
                              )
        Defendants.           )

## ORDER

**NOW**, this 18th day of September, 2013, the court having conducted a bench trial on the issue of Plaintiffs Loretta and Michael Burtons' damages resulting from a November 25, 2007 car accident, and upon consideration of the parties' respective filings, including Plaintiffs' Proposed Findings of Fact and Conclusions of Law (Doc. 62) and Defendants' Proposed Findings of Fact and Conclusions of Law (Doc. 61), and for the reasons set forth in the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that Plaintiffs' request for relief is **GRANTED** in the amount of **\$9,095.80**.

**BY THE COURT:**

**KIM R. GIBSON
UNITED STATES DISTRICT JUDGE**